Ghassan "Gus" Bridi (SBN 188070)
gbridi@bridilawfirm.com
THE BRIDI LAW FIRM
15760 Ventura Blvd., Suite 700
Encino, CA 91436

PHILIP J. LAYFIELD, ESQ. (SBN 204836)
THE LAYFIELD LAW FIRM, APC
100 Wilshire Blvd., Suite 950
Santa Monica, California 90401
Telephone: (310) 956-1497
Facsimile: (800) 644-9861

Attorneys for Plaintiff,
Christy Weston

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRIC OF CALIFORNIA

| | |
|---|---|
| CHRISTY WESTON,<br><br>Plaintiff,<br><br>vs.<br><br>INDYMAC MORTGAGE SERVICES, a Division ONEWEST BANK FSB aka ONEWEST BANK GROUP, LLC, a Delaware Limited Liability Company; QUALITY LOAN SERVICE CORP., a California Corporation; DEUTSCHE BANK NATIONAL TRUST COMPANY, a National Banking Association; INDYMAC INDX MORTGAGE LOAN TRUST 2007 FLX RAY 3; MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., a Delaware Corporation; and DOES 1-10 inclusive.<br><br>Defendants, | Case No.: 2:10-cv-10-02198-GAF-(FFMx)<br><br>**SECOND AMENDED COMPLAINT:**<br><br>**1. VIOLATION OF REAL ESTATE SETTLEMENT PROCEDURES ACT (12 USC Sec. 2605, et. seq.)**<br><br>**2. VIOLATION OF CALIFORNIA BUSINESS ANDPROFESSIONS CODE Sec. 17200**<br><br>**3. CIVIL RICO** |

COMES NOW, Plaintiff CHRISTY WESTON, and alleges as follow:

**PARITES**

1. Plaintiff CHRISTY WESTON, an individual, currently maintains her primary residence at 5144 Basucle Ave, Woodland Hills, CA ("Subject Property" or "Subject Residence"). Plaintiff has resided in the Subject Property for 20 years.

2. Plaintiff is informed and believes, and thereon alleges, that at all times mentioned herein, Defendant, ONE WEST BANK, FSB was a federal savings bank owned by a Delaware Limited Liability Company One West Bank Group, LLC (hereinafter collectively "WB"), that INDYMAC BANK, FSB and INDYMAC FEDERAL BANK (hereinafter "INDYMAC") which was taken over by the Federal Deposit Insurance Corporation on or about July, 2008. OWB and its loan servicing division are in the business of providing mortgage products and services in the State of California.

3. Plaintiff is informed and believes, and thereon alleges, that at all times mentioned herein, Defendant QUALITY LOAN SERVICE CORP. ("QUALITY") was a servicer of the Subject Loan issued by Indy Mac Bank on or about March 27, 2007.

4. Plaintiff is informed and believes, and thereon alleges, that at all times mentioned herein, Defendant DEUTSCHE NATIONAL TRUST COMPANY was a national banking association doing business in California and was a loan servicer at all times mentioned herein.

5. Plaintiff is informed and believes and thereon alleges, that at all times mentioned herein, the Subject Loan was securitized by INDYMAC and sold as INDYMAC INDX 2007 MORTGAGE LOAN TRYST 2007 FLC RAY 3 ("RAY 3") in April, 2007, a month after it was issued. RAY 3, at all times mentioned herein was a loan servicer and subject to RESPA.

6. Plaintiff is informed and believes and thereon alleges, that at all times mentioned herein that MORTGAGE ELECTRONIC REGISTRATION

SYSTEMS, INC. is a Delaware Corporation ("MERS"), doing business in the State of California, and at all times mentioned herein, is a loan servicer subject to RESPA.

7. The Plaintiff is ignorant of the true names and capacities of the Defendants sued herein as DOES 1-10, inclusive, and therefore sues these defendants by such fictitious names. The Plaintiff will amend this complaint to allege their true names and capacities when ascertained.

8. *Plaintiff is informed and believes and thereon alleges that each of the* fictitiously named defendants is responsible in some manner of the occurrences herein alleged, and that the plaintiff's damages has herein alleged were proximately caused by their conduct.

9. Plaintiff is informed and believes and thereon alleges, that at all times mentioned herein each of the Defendants was the agent of each of the remaining Defendants, and/or acted with their knowledge consent, ratification an authorization, and in doing the acts alleged herein, each of the Defendants acted in such capacity with respect to the remaining Defendants.

**JURISDICTION AND VENUE**

10. This Court has subject matter jurisdiction based upon federal question under 12 USC Sec. 2614. This is an action asserting violations of federal statutes commonly known as "RESPA."

11. Venue is proper in this Court pursuant to 28 USC Sec. 1391(b)(2), in that a substantial part of the events giving rise to the claims asserted herein occurred in this judicial district and the Subject Property is located in this judicial district.

12. This Court has personal jurisdiction over the parties as all Defendants engage in business within the State of California, County of Los Angeles, and thus have sufficient contacts.

13. This Court has jurisdiction over the state claims by virtue of pendant jurisdiction.

**INTRODUCTION**

14. This case involves a course of predatory lending practices which have caused Plaintiff, who is caretaker for her quadriplegic sister in the residence, to lose all of the equity in her home and be faced with bankruptcy and/or leaving the they have occupied for approximately 20 years and modified to suit the disabled sister's particular needs.

15. Plaintiff's primary source of income was her sister's monthly State of California In-Home Care Benefit. When Defendants, and each of them, qualified Plaintiff for a $665,000 refinanced loan ("Subject Loan") and took a secured interest in her home, they failed to abide by the most important underwriting guideline governing whether a loan should issue—determining if Plaintiff had sufficient income to pay the monthly payments. Instead, on information and belief, they qualified Plaintiff for the Subject Loan based exclusively on the equity in Plaintiff's home at the time the loan application was filed.

16. The property at issue Plaintiff's primary residence and situated at 5244 Basucle Ave in Woodland Hills, California ("Subject Property") and was estimated to be worth approximately $950,000 at the time the Subject Loan was issued.

17. Defendants, in writing, informed Plaintiff that the Subject Loan was approved based on "…your credit history and any proposed change in your monthly mortgage payment." However, Defendants verbally indicated to Plaintiff that she was only eligible for "high risk" loans BECAUSE of her credit history.

18. Plaintiff was therefore led into a series of "high risk" refinances at great cost to her including one with "Homecomings" in 2005, followed by

two with INDYMAC BANK in 2006 and 2007. In each transaction, Plaintiff was informed by Defendants "this would be the last time she needed to refinance, and the next time she would be able to get a 'stable' loan she could afford on a long term basis." Defendants, knew that the only way Plaintiff could pay for the Subject Loan was to continue to strip equity out of her home through repeated refinancing.

19. Defendants' actions were classic predatory lending practices. The United States of Office of the Comptroller of Currency has opined on what is characterized as a touchstone of predatory lending, i.e., where the lender fails to determine whether a borrower can reasonably be expected to repay the loan from resources OTHER THAN the collateral in the home. *O.C.C. Policy Letter AL2003-2.* Elaborating, the Office of the Comptroller noted that, when a lender relies upon the liquidation of the borrower's collateral, it commits classic acts of predatory lending. The Defendants in this case could not possibly have relied upon anything other than the liquidation value of the collateral in Plaintiff's home as the basis for granting her the loan at issue in this case.

20. Defendants routinely, as a course of their common business practice, return all of their borrowers' Qualified Written Requests ("QWR") without complying with the requests and as a further course of their common business practice, routinely fail to provide personal contacts for discussions of voluntary resolution of complaints.

21. On information and belief, Plaintiffs' loan is part of a Special Purpose Vehicle ("SPV"), which issues securities to certificate holders rather than issuing an entire loan to one individual investor. Therefore, Defendants, and each of them, have no authority to modify the loan under the terms governing the servicing of loans within an SPV and do not have authority to

move forward with a foreclosure action and/or potentially collect payments under the Promissory Note associated with the Subject Property.

22. Nevertheless, Defendants, and each of them, have unlawfully initiated foreclosure proceedings on Plaintiff's home. This egregious interfusion of predatory lending, elder abuse, and wrongful foreclosure, have resulted in horrific and devastating financial loss to the vulnerable and unsuspecting borrower.

23. One of the hey consumer protections under RESP is the ability of the borrower to send a QWR to his loan servicer asking for an accounting of all money owing, late fees charged, etc. When the borrower sends a QWR to its lender, the lender has 20 days to acknowledge receipt of the QWR and 60 days to provide a substantive response.

24. On or about December 30, 2009, Plaintiff sent a QWR to Defendant INDYMAC with a copy to "QUALITY," who was purportedly appointed by INDYMAC'S predecessor, IndyMac Federal Bank, as the substitute trustee for the Subject Loan. Follow-up correspondences in the form of additional QWR's were sent on 01/15/10, 02/23/10, 03/08/10 and 03/19/10. Notice of intent to sue was sent via facsimile and regular mail on 03/23/10.

25. Rather than to respond to Plaintiff's QWR, INDYMAC forwarded the QWR internally to OneWestBank, who did not acknowledge receipt until 27 days later on 01/26/10. As of the date of the Pleading, INDYMAC has failed to ever provide a substantive response to any of Plaintiffs' QWRs.

26. INDYMAC made a series of demands prior to and since 12/30/09 that are plagued with contradictory statements regarding the amount of money Plaintiff owes on the Subject Loan and has failed and refused to identify the true owner the true owner of the Subject Loan and has failed and refused to provide Plaintiff with the documents she requested, even though Plaintiff

submitted multiple authorizations and a check for payment of costs of duplication.

27. On information and belief, Plaintiff's loan was securitized. As such, on information and belief, the funds borrowed by Plaintiff did not come from any source Plaintiff could identify. Additionally, the "investor" or "investors" who provided the money for the Subject Loan is concealed by the Defendants, and each of them.

28. On information and belief a loan modification often results in a recovery on a net present value basis greater than a foreclosure, especially if there is a principal reduction in the loan and that is true of Plaintiff's Subject Property and Loan. Plaintiff worked assiduously to complete the modification with INDYMAC and her package was submitted by the Los Angeles Neighborhood Housing Services, a HUD approved counselor, on February 23, 2010. This has been completely ignored and Defendants have failed and refused, and continue to fail and refuse, to cancel the foreclosure sale of the Subject Property.

**FACTUAL ALLEGATIONS**

29. On or about March 23, 2007, Plaintiff signed a promissory note for the Subject Loan resulting in initial payments of $2,251.00 per month. From the outset, this payment amount resulted in negative amortization, but there were also provisions for the payments to increase drastically over time.

30. Defendants failed to make the appropriate Truth in Lending Act disclosures to Plaintiff, identifying the true nature of the Subject Loan prior to closing.

31. INDYMAC repeatedly told Plaintiff she was getting the loan she could get and promised they were acting in Plaintiff's (and only Plaintiff's) best interest. Plaintiff was told by INDYMAC that in the following year she would be eligible for a loan on terms she could afford long term, and it was

on reliance on this misrepresentation that she agreed to enter into the subject loan.

32. The terms of the Subject Loan were memorialized in a promissory note. The deed of trust identified INDYMAC as the lender. In agreeing to sign the loan documents and to encumber the Subject Property with a deed of trust, Plaintiff relied upon the promises made by Defendants' predecessor in interest, just as they intended.

33. *About a month after the closing of the loan, there was, unbeknownst* to Plaintiff, a securitization and assignment, sale and/or transfer of loan servicing rights and obligations in connection with the Subject Loan by Defendants to Defendant DEUTSCHE and RAY 3 investors. On information and belief, INDYMAC specialized in servicing high-risk mortgages, that is, mortgages at or near the foreclosure phase. DEUSTSCHE and RAY 3 knew or should have known of the fraudulent conduct of INDYMAC and that they (DEUTSCHE and RAY 3) were furthering and compounding the fraudulent scheme, making it their responsibility, both joint and several, by acting in concert with them.

34. On or about 12/11/08 INDYMAC appointed QUALITY as purported Substitute Trustee on the subject deed of trust. It was disclosed at that time that MERS was the purported nominee of INDYMAC as beneficiary. On December 4, 2009, a Notice of Default ("NOD") in connection with the Subject Property was filed and served by QUALITY on Plaintiff claiming a default in the amount of $53,406.37 as of December 4, 2009. Attached to the NOD is a false statement by an agent for Defendant Quality Loan Service claiming the beneficiary or its agent contacted the borrower as required by Cal. Code Civ. Proc. Sec. 2923.5 or that the beneficiary or its agent contacted the borrower as also required by the Code or that the beneficiary is exempt.

35. On information and belief, Plaintiff alleges the amount to be claimed to be in default is incorrect and/or includes charges not permitted under the loan.

36. On or about 12/30/09, Plaintiff sent a QWR pursuant to RESPA requesting an accounting and also including a request for a copy of the promissory note with any modifications thereto and a beneficiary statement pursuant to Sec. 2943. Plaintiff sent supplemental QWRs to INDYMAC and QUALITY on 01/15/10, 02/23/10, 03/08/10, and 03/19/10.

37. QWR's were also sent to the other Defendants, and each of them, including DEUTSCHE, MERS, and RAY 3.

38. RESPA requires a lender to respond to a borrower who submits a QWR. Per RESPA, the lender has 20 days to acknowledge receipt of the QWR and, within 60 days, to perform an adequate investigation, provide the requested information, make any corrections to the borrower's account, including correcting erroneous late charges or penalties, provide written notification of these credits, provide a written explanation of why the account is correct, and include the name and telephone number of the service representative. Under Sec. 2934, Defendants, and each of them had 21 days to respond and provide any modifications to the promissory note, including any assignments.

39. Defendants, and each of them, failed to provide the information required under Sec. 2943 and RESPA.

40. Rather than responding to the QWR's the Defendants and each of them, acting in concert and through INDYMAC, returned all Plaintiff's QWR documentation with repeated demands for signed authorization that had already been submitted and acknowledged. Even after Plaintiff signed and returned new authorization and submitted a check for payment of copies of documents, Defendants and each of them, acting in concert through

INDYMAC failed to act under the QWR, again asking for signed authorizations.

41. One of the pieces of information Plaintiff sought in her QWR is the true owner and holder of the Promissory Note ("Note"). INDYMAC concealed that information who purportedly has possession of the NOTE and who also purportedly would receive the proceeds of any foreclosure or other collection orchestrated by the Defendants, and each of them.

42. INDY and QUALITY have made false representations concerning the *amounts owing under the Note with the intent to defraud Plaintiff into* continuing to make payments under the note, and in order to foreclose on her property. Neither INDYMAC nor QUALITY have shown the amount claimed owing on the loan has been calculated properly and on information and belief, they cannot do so.

43. In recording the above referenced Notice of Default, Defendants, and each of them, acting in concert and through INDYMAC and QUALITY, unlawfully initiated non-judicial foreclosure proceedings against Plaintiff by recording a Notice of Default and by improperly claiming amounts not owing.

44. On or about 03/08/10 QUALITY recorded a Notice of Trustee's Sale in connection with the Subject Property for default under the above-referenced deed of trust, based on alleged defaults not owed on the loan of $767,826.50. On information and belief, this was not the correct amount owing and QUALITY and INDYMAC (the servicers of the loan) failed and refused to provide an accounting in response to statutory demands for same along with the other Defendants, and each of them, acting in concert and through INDYMAC and QUALITY.

45. On information and belief, Plaintiff alleges QUALITY and INDYMAC systematically conspire with the other named Defendants in this

action, and each of them, in a design and scheme to unlawfully foreclose on residential properties, Plaintiff's subject property among them. Defendants and each of them either knew or should have known that INDYMAC is either unwilling or unable to accurately set forth the amounts in default. The Defendants and each of them further either knew or should have known that neither INDYMAC nor QUALITY is the real party in interest to foreclose on this property and fraudulently concealed this information from Plaintiff in order to advance this scheme.

46. In committing the acts as alleged in this Complaint against Plaintiff and other owners of residential real properties who use those properties to secure loans with Defendants and each of them, the Defendants and each of them are engaging in a pattern and practice of unlawful activity. In pursuing non-judicial foreclosures, Defendants fraudulently represented they have the right to payment under the Note in connection with the Subject Loan (as it applies in Plaintiff's circumstance), payment of which was secured by a deed of trust. Whereas, in fact, none of the Defendants were in possession of the Note and none of them were either holders of the Note or non-holders of the Note entitled to payment, as those terms are used in the California Commercial Code Sec. 3301 and 3309. The Defendants, and each of them, were proceeding to foreclose on the Subject Property without rights under the law.

47. The final stage of a foreclosure proceeding is a sale of the property through a public auction at which the current beneficial owner of the right to foreclose is the only lawful party who can provide instructions to the trustee on the amount of money to accept at the sale or to "credit bid" up to the amount owed on the loan. MERS is the named "nominal" beneficiary but is not, in fact, the beneficiary entitled to foreclose. In fact, none of the Defendants named in this Complaint, nor any of their purported authorized

agents, who have played a part in the non-judicial foreclosure proceedings are entitled to receive payment from the loan proceeds, or the Subject Property. The assertion made in the foreclosure proceedings that the beneficiary named on the trust deed is entitled to foreclose and the notices of default and trustee sale based on mounts not properly owing are acts of fraud or deceit within the meaning of Cal. Civ. Code Sec. 2924(h).

## FIRST CAUSE OF ACTION

## VIOLATION OF THE REAL ESTATE SETTLEMENT PROCEDURES ACT

## 12 U.S.C. Sec. 2605 et seq.

## (As to ALL Defendants)

48. Plaintiff re-alleges and incorporates herein by reference, each and every allegation contained above as though fully set forth herein.

49. The Subject Loan is a mortgage loan subject to the provisions of RESPA.

50. On or about December 30, 2009, Plaintiff, through her attorney, sent Defendants QUALITY (with copies to all Defendants, and each of them) a QWR as defined under RESPA, 12 USC Sec. 2605(e)(1)(B), regarding the crediting of payments on her mortgage account asking for an accounting, as well as a demand for a copy of the Note with any modifications, and a beneficiary statement under Cal. Civ. Code. Sec. 2943. Follow up correspondences were sent to QUALITY (with copies to all Defendants, and each of them) on 01/15/10, 02/23/10. 03/08/10, and 03/19/10. Notice of Intent to Sue was sent via facsimile and regular mail on 03/23/10.

51. On or about 02/23/10, Plaintiff, through her attorney, sent both INDYMAC and QUALITY (with copies to all Defendants, and each of them) a supplemental QWR under RESPA, requesting all documents evidencing the identity of the owner and holder of the Note and mortgage in

connection with the Subject Property, including the complete chain of title to ownership of the Note and mortgage to the Subject Property.

52. INDYMAC initially acknowledged receipt by letter dated 01/26/10 and responded by stating it did not know whether to treat the QWR as such. INDYMAC represented they would investigate the issue. Though Plaintiff's next letter of 02/23/10 was captioned "Qualified Written Request", and each correspondence thereafter incorporated the totality of documents constituting the QWR, Defendant INDY sent a letter to Plaintiff on 03/15/10 stating it still did not know whether to treat the package as a QWR. In the meantime, each and every correspondence was returned to Plaintiff's attorney by INDYMAC while acting in concert with the other Defendants, and each of them, as above stated. No other responses were provided.

53. Defendants INDYMAC and QUALITY, and the other Defendants and each of them acting in concert and through INDYMAC and QUALITY, violated RESPA by, *inter alia:*

   a. Failing to provide a servicing statement as set forth in 12 U.S.C. Sec. 2605 (a);
   b. Reg. X Sec. 3500.21(b);
   c. Failing to properly respond to Plaintiff's QWR as set forth in 12 USC Sec. 2605(e) and Reg. X Sec. 3500.21(e);
   d. Failing to provide the information requested by Plaintiff;
   e. Failing to make corrections to Plaintiff's account;
   f. Failing to provide written notification of correction;
   g. Failing to provide a written explanation of why the servicers believe the account in connection with the subject loan is correct;
   h. Failing to provide the name and telephone number of an INDYMAC representative in response to the QWR (instead,

    borrowers, including Plaintiff, are diverted to a computerized phone pool and never assigned a representative);

i. Failing to cease their collection efforts and foreclosure proceedings after receiving Plaintiff's QWR by continuing with foreclosure, including service of the Notice of Sale on March 8, 2010 and repeated failure and refusal, despite written and oral demands to cancel and/or continue the sale date;

j. Providing information to consumer reporting agencies regarding "overdue" payments allegedly owed by the Plaintiff that were related to her QWR

54. Plaintiff is informed and believes, and thereon alleges, that Defendants named herein engage in a pattern or practice of non-compliance with the requirements of mortgage servicer provisions of RESPA. Specifically, the pattern or practice of non-compliance includes, *inter alia*, the following tactics:

a. Marketing sub-prime loans to unqualified borrowers;

b. Falsely representing to the borrowers the details of the loan, including in many instances, the negative amortization components of the loan and/or the full details in terms of payments resulting from adjustable rates during the lifetime of the loan;

c. After funding the loans, securitizing the loans so that parts of the loans are actually owned by several unknown parties, making it impossible to determine who is the real party in interest under the Promissory Notes and who has the authority to foreclose on the residential properties or collect payments on the residential properties;

d. Creating an internal process within their companies to refute the validity of any bona fide QWR submitted by a borrower or on behalf of a borrower;

    e. Creating a process which fails to address requests made under the QWRs received;

    f. Creating a process which, rather than assigning a representative to answer questions and issues raised by bona fide QWRs, diverts borrowers to a phone pool in which no issues raised in the QWR are substantively in place; and

    g. Create a process to unlawfully collect mortgage payments and/or foreclose on properties in which the Defendants, and each of them, cannot prove they are actual parties in interest.

55. As a direct and proximate result of Defendants', and each of their, aforementioned violations of RESPA, Plaintiff has suffered the following damages:

    a. Being forced into a mortgage that has terms severely unfavorable to Plaintiff with interest rates not fixed, resulting in a pecuniary loss in an amount that will be proven at trial. The specific pecuniary loss occurred not during the time period prior to sending the QWR's but subsequent to their sending. Had Plaintiff been informed of the precise terms of the loans even after sending the QWR's, she could have pursued alternative financing that would have given her more favorable terms and her specific pecuniary loss is represented by the time period she sent the QWR's onward—namely the difference between the unfavorable terms beginning from that time period until such time as she was able to secure a loan on more favorable terms;

b. The unlawful assessment of penalties and "late fees" which have forced Plaintiff to incur a pecuniary loss in an amount that will be proven at trial;

c. The foreclosure of her home in lieu of a modification which will result in a pecuniary loss to Plaintiff in an amount to be proven at trial;

d. Given the need for the Subject Property as a place to provide care for Plaintiff's severely disabled sister, and with the general despicable conduct demonstrated by Defendants and each of them, Plaintiff has suffered severe emotional distress, in an amount to be proven at trial;

e. Pecuniary loss in the form of pre-payment penalties, in an amount to be proven at trial;

f. Attorney's fees associated with defending Plaintiff's rights under RESPA;

g. Plaintiff further suffered pecuniary loss in the form of various finance fees in an amount to be proven at trial; and

h. Plaintiff was also forced to incur broker and loan origination fees in an amount to be proven at trial.

**SECOND CAUSE OF ACTION**

**VIOLATION OF CALIFORNIA**

**BUSINESS AND PROFESSIONS CODE SEC. 17200**

**(As to all Defendants)**

56. Plaintiff re-alleges and incorporates by reference, each and every allegation contained in the preceding paragraphs as though fully set forth herein..

57. By committing the acts described herein Defendants, and each of them, have engaged in unfair business practices, causing injury and damages

to Plaintiff as also more fully set forth above, and therefore violated California Business and Professions code section 17200.

58. The Unfair, Unlawful, and Fraudulent Business practices engaged in by the Defendants and each of them are fully set forth in paragraphs 48-55 above.

59. Plaintiff is therefore entitled to disgorgement of Defendants' profits or restitution.

**THIRD CAUSE OF ACTION**

**CIVIL RICO**

**(As to all Defendants)**

60. Plaintiffs reaffirm and reallege paragraphs above herein as if specifically set forth more fully herein below.

61. Defendants are "persons" as defined by ORC sec. 2923.31(G).

62. The conspiracy the subject of this action has existed from the date of application to the present, with the injuries and damages resulting there from being continuing.

63. Defendants' actions and use of multiple corporate entities, multiple parties, and concerted predetermined acts and conduct specially designed to defraud Plaintiffs constitutes an "enterprise," with the aim and objective of the enterprise being to perpetrate a fraud upon the Plaintiff's through the use of intentional nondisclosure, material misrepresentation, and creation of fraudulent loan documents.

64. The acts constituting the conspiracy include, *inter alia*, the actions identified in paragraphs 14 through 47 and 49 through 55 above.

65. As fully set forth in paragraph 14 through 47 and 49 through 55 above, Defendants, and each of them, by virtue of engaging in those activities have engaged in "racketeering activity."

66. By virtue of being national lending institutions, sending correspondences including invoicing and marketing materials through US Mail, utilizing interstate phone lines, utilizing electronic mail to cross state lines, securitizing mortgages and selling them on national exchanges, Defendants, and each of their conduct are enterprises which engage in or affect interstate or foreign commerce.

67. The nexus between the pattern of racketeering activity and the enterprise engaged in by the Defendants, and each of them, are fully set forth in paragraphs 14 through 47 and 49 through 55 above, above.

68. Plaintiff has been damaged in her business or property by the actions of the Defendants, and each of them, by engaging in the activities described in the preceding paragraphs of this cause of action in the following manner:

    a. Being forced into a mortgage that has terms severely unfavorable to Plaintiff with interest rates not fixed, resulting in a pecuniary loss in an amount that will be proven at trial. The specific pecuniary loss occurred not during the time period prior to sending the QWR's but subsequent to their sending. Had Plaintiff been informed of the precise terms of the loans even after sending the QWR's, she could have pursued alternative financing that would have given her more favorable terms and her specific pecuniary loss is represented by the time period she sent the QWR's onward—namely the difference between the unfavorable terms beginning from that time period until such time as she was able to secure a loan on more favorable terms;

    b. The unlawful assessment of penalties and "late fees" which have forced Plaintiff to incur a pecuniary loss in an amount that will be proven at trial;

    c. The foreclosure of her home in lieu of a modification which will result in a pecuniary loss to Plaintiff in an amount to be proven at trial;

d. Given the need for the Subject Property as a place to provide care for Plaintiff's severely disabled sister, and with the general despicable conduct demonstrated by Defendants and each of them, Plaintiff has suffered severe emotional distress, in an amount to be proven at trial;

e. Pecuniary loss in the form of pre-payment penalties, in an amount to be proven at trial;

f. Attorney's fees associated with defending Plaintiff's rights under RESPA;

g. Plaintiff further suffered pecuniary loss in the form of various finance fees in an amount to be proven at trial; and

h. Plaintiff was also forced to incur broker and loan origination fees in an amount to be proven at trial.

WHEREFORE PLAINTIFF prays as follows:

(As to All Defendants)

1. For statutory damages in the amount of $1000 per violation pursuant to 12 U.S.C. Sec. 2605(f) and Reg. X 24 CFR Sec. 3500.21 (f);
2. Order defendant to take all action necessary to terminate any security interest in Plaintiff's property created under the transaction and that the Court declare all such security interests under the transaction void, included but not limited to the Subject Loan;
3. Order the return of any money or property given by the Plaintiff given to the Defendants and each of them;

4. Award actual damages in an amount to be established at trial;
5. An award of general damages;
6. An award of exemplary and punitive damages;
7. Quiet title in the subject property;
8. For a temporary restraining order, a preliminary injunction, and a permanent injunction enjoining defendants and each of them and their agents, servants, and employees and all persons acting under, in concert with or for them from:
   a. Claiming any interest in the subject property;
   b. From selling, transferring, foreclosing or otherwise disposing of the subject property; and
   c. Requiring Defendants to provide the information requested in the QWR and the Sec. 2934 Demands issued by Plaintiff.
9. Disgorgement of Defendants profits or restitution.
10. Award the plaintiff costs and reasonable attorney's fees; and
11. Award such other relief as the Court deems just and proper.

Dated this 14th Day of February, 2011 THE BRIDI LAW FIRM

By: ______________________

Ghassan "Gus" Bridi, Esq.
Attorney for Plaintiff,
Christy Weston